[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 07, 2003
THOMAS K. KAHN
CLERK

—————————————————

No. 01-15124

———————————————

D.C. Docket No. 97-02439-CV-JLK

NATIONAL FIRE INSURANCE COMPANY OF HARTFORD,

Plaintiff-Counter-
Defendant-Appellee,

versus

FORTUNE CONSTRUCTION COMPANY,

Defendant-Counter-
Claimant-Third-Party-
Plaintiff-Appellant,

ARKIN CONSTRUCTION COMPANY, INC.,

Third-Party-Defendant.

—————————————————

Appeal from the United States District Court
for the Southern District of Florida

—————————————————

**(February 7, 2003)**

Before TJOFLAT and KRAVITCH, Circuit Judges, and VINSON[*], District Judge.

VINSON, District Judge:

The primary issue presented by this appeal is whether a surety on construction contract performance and payment bonds issued on behalf of a subcontractor has superior rights to retained contract balances in the possession of the general contractor when the general contractor completed the performance and has unsatisfied claims against the defaulting subcontractor.

## I.    BACKGROUND

This case arises out of two construction projects - - - the Winston Park project in Coconut Creek, Florida, and the West Brickell project in Miami, Florida.  As general contractor on the projects, Fortune Construction Company ("Fortune") entered into two separate subcontracts with Arkin Construction Company ("Arkin") to build the two apartment complexes, the Winston Park Subcontract and the West Brickell Subcontract.  National Fire Insurance Company ("National Fire"), as surety, issued on behalf of Arkin, as principal, performance and payment bonds for the two construction projects.  The performance bond and payment bond documents for the Winston Park project were standard forms issued by the American Institute of

[*]Honorable Roger Vinson,  United States District Judge for the Northern District of Florida, sitting by designation.

Architects.[1]  The performance bond and payment bond documents for the West Brickell project were drafted by National Fire with language that materially differed from the Winston Park bonds.  Each of the performance bonds and each of the payment bonds incorporated the appropriate subcontract between Fortune and Arkin by reference.

During construction of the two projects, Arkin began experiencing financial difficulty. National Fire provided financing to Arkin for a short time, but later refused to continue to finance Arkin.  Both projects were behind schedule by this time. Arkin's financial difficulties prompted Fortune and National Fire to enter into negotiations about what to do when Arkin defaulted.  There was some discussion about National Fire procuring a completion contractor and about the possibility that Fortune could complete construction. The West Brickell project was near completion, but a substantial amount of work still needed to be done on the Winston Park project. Negotiations were still ongoing when, on May 29, 1997, Arkin abandoned both construction projects.  On June 12, 1997, Fortune declared Arkin in default and notified National Fire accordingly.

A flurry of letters between the attorneys for Fortune and National Fire ensued. During this increasingly acrimonious exchange, National Fire contends that it

---

[1]AIA Document A311.

tendered, or offered to tender, a completion contractor. While National Fire asserts that Fortune rejected this tender because Fortune wanted to complete construction itself, Fortune maintains that the tender was never made. Fortune demanded that National Fire perform its obligations under both performance bonds by completing the subcontracts. National Fire did not do so. While National Fire made payments to payment bond claimants on both projects, both of the construction projects were actually completed by Fortune as the general contractor, and Arkin is now a dissolved corporation.

The construction subcontracts between Fortune and Arkin each contained a clause obligating Arkin to pay liquidated damages for delays in completing the projects. The Winston Park Subcontract provided for liquidated damages of $35 per day per incomplete apartment and $1,000 per day for incomplete common areas. The West Brickell Subcontract provided for liquidated damages after a specified date of $30 per day per incomplete apartment. Due to Arkin's dilatory performance during the Winston Park and West Brickell construction, Fortune invoked these liquidated delay damages clauses before Arkin abandoned the projects. By the time Arkin defaulted, Arkin owed $1,693,500 in liquidated delay damages on the Winston Park project and $93,600 in liquidated delay damages on the West Brickell project. The subcontracts also made Arkin responsible for the acts and omissions of its own sub-

4

subcontractors. Allied Fire Protection Systems ("Allied"), one of Arkin's sub-subcontractors, failed to pay Davis-Bacon Act wages to its laborers for work performed on the West Brickell project, which apparently involved federally subsidized housing. Consequently, the Department of Labor jointly charged Fortune, Arkin, and Allied a total of $71,126 in back wages attributable to Allied's improper payments, which Fortune paid.

In addition to the West Brickell Subcontract between Fortune and Arkin, the parties entered into a letter agreement dated January 15, 1996 (the same date as the West Brickell Subcontract). This letter agreement recognized that the electrical work had been excluded from Arkin's subcontract on the West Brickell project, but that Arkin had full responsibility for cost overages if the cost of the electrical work exceeded $669,000. Arkin's responsibility was "either finding a replacement subcontractor" for the electrical work at $669,000 or "issuing a credit change order to Fortune" for any amount incurred over and above $669,000.[2] However, this letter

_____

[2]The typed letter, dated January 15, 1996, signed by both Fortune and Arkin, stated in pertinent part:

> RE:  Construction Contract dated January 15, 1996 for
>        West Brickell Apartments
>
> Dear Mr. Arkin:
>
> The Schedule of Values attached to the . . . contract . . . states that the electrical, elevator and cabinet

agreement was not listed as part of the contract documents in the West Brickell

Subcontract, which contained two merger and integration clauses. During the West

Brickell construction, Fortune's original electrical subcontractor, Monohan's Electric

Co., defaulted and did not complete the electrical work. Arkin failed to provide

another electrical contractor to complete the project within the fixed $669,000 price.

In hiring another electrical contractor, Fortune incurred additional costs amounting to

$404,118.81 in excess of $669,000,[3] for which Fortune claims a credit against Arkin.

---

> trades have been excluded from said contract. The agreement between Fortune and Arkin is that even though these items have been excluded from said Contract, and despite the fact that the contracts with these trades are to be signed by Fortune (not Arkin), Arkin takes full responsibility for cost overages should the contract amounts for each of these trades exceed the following figures: (a) electrical – $669,000, (b) elevator – $185,000 and (c) cabinets – $110,916.
>
> This responsibility on the part of Arkin includes, but is not limited to, either Arkin finding a replacement subcontractor to contract for the specific trade at the above referenced amounts, or Arkin issuing a credit change order to Fortune for any amounts over and above the above referenced figures. . . .

(R.85, Ex. C.)

[3]The affidavits of Michael Spetko, the Project Manager for the West Brickell project, and Ernesto Gordo, an employee of Fortune who participated in negotiating the West Brickell Subcontract with Arkin are in the record. (R.89.) In these affidavits, Spetko and Gordo assert that they were involved in negotiating the subcontract and that the letter agreement was intended by both Arkin and Fortune to be an integral part

After Fortune completed the two construction projects, Fortune presented National Fire with an accounting of its "performance" costs to complete the Arkin subcontracts. National Fire then prepared an accounting of the net remaining contract proceeds.[4] According to National Fire, the remaining contract proceeds exceeded Fortune's costs of completion. National Fire requested that, according to the terms of the bonds, the unpaid contract balances be credited to the respective subcontracts and paid to National Fire, as the subrogee of Arkin. Fortune refused to pay National Fire the contract balances, claiming that it had superior right to the contract balances due to National Fire's failure to perform on its performance bonds and because of Fortune's right to set off the remaining contract claims Fortune had against Arkin. National Fire initiated this civil action against Fortune alleging assignment of Arkin's rights under the subcontracts, equitable subrogation, and breach of the bond contracts. Fortune filed a counterclaim against National Fire for failure to perform under the performance bonds and failure to make the required payments under the payment

---

of the subcontract on the West Brickell project. Gordo added that the letter agreement was made an addendum to the subcontract. There is nothing in writing evidencing incorporation of the letter agreement.

[4]Fortune retained possession of certain proceeds from the two subcontracts pursuant to retainage and progress-payment provisions of the subcontracts. However, the exact amount of contract balances remaining is a matter of dispute between the parties.

bonds with respect to payments for Davis-Bacon Act violations, electrical overages, and the liquidated delay damages. Fortune also joined Arkin as a third party defendant responsible for the same damages, due to its breach of the two subcontracts.

Before trial, National Fire filed seven different motions for partial summary judgment.[5] The district court entered three separate orders granting partial summary judgment with respect to several of National Fire's motions and granted the remainder in a pretrial conference order. In its first partial summary judgment order, the district court pointed to the language of the "Performance Bond Contract," although the court did not specify <u>which</u> performance bond,[6] and held that National Fire had a right to equitable subrogation "under the payment and performance bonds." Thus, the district court held that National Fire's equitable subrogation right to the contract balances was superior to Fortune's right to set off its claims against Arkin under both the payment

---

[5]Each motion addressed a discrete legal issue, and five of the motions were simultaneously filed. We discourage this practice of unnecessarily filing multiple motions for partial summary judgment. While the legal issues in this case are complex, combining the various legal issues into a single motion would have helped the trial court achieve a broader understanding of the entire case. National Fire's attempt to break this case into little pieces seems to have contributed to the confusion below. <u>See</u> <u>also</u> S.D. Fla. Loc. R. 7.1(C)(2).

[6]As noted earlier, the documents were different for each project. From examining the language quoted by the district court, we determine that the court cited the Winston Park performance bond. The district court made reference to neither the language of the West Brickell performance bond nor either of the two payment bonds.

and the performance bonds. In its pretrial conference order, the district court characterized this ruling as establishing that, to the extent the contract balances exceeded Fortune's reasonable costs to complete construction after Arkin's default, "the excess is to be paid to National Fire up to the amount of National Fire's payment bond expenditures." (R.67 at 2.) In that same order, the district court held that "National Fire had no obligation to complete [construction itself] or to tender [a completion contractor], but rather its obligation was to pay the excess of the costs to complete the contract over the contract balance, if any."[7] (R.67 at 3.) According to the district court, as a matter of law, National Fire's failure to complete construction or to arrange for the completion of construction was not a breach of National Fire's performance bond obligations, and thus Fortune was not entitled to consequential damages from National Fire for the costs that Fortune incurred due to Arkin's default under the subject subcontracts.

In its second order granting National Fire partial summary judgment, the district court held that the letter agreement between Fortune and Arkin concerning liability for electrical overages was a separate agreement that had not been integrated into the contracts on which the bonds had been issued. In its third order granting National Fire

---

[7]Again, in making this determination, the district court did not cite any of the operative language from any of the bonds in support of its ruling. National Fire's performance obligations materially differed under the two performance bonds.

9

partial summary judgment, the district court summarily dismissed with prejudice Fortune's Davis-Bacon wage claim against National Fire, without explanation.

At trial, the district court directed judgment as a matter of law in favor of Fortune on its third party claim against Arkin in the amount of $1,748,150 as to the Winston Park project and $432,000 as to the West Brickell project. These amounts included the Davis-Bacon wage claim, the electrical overage costs, and the liquidated delay damages.[8] After this ruling, the only issues that remained for the jury at trial were: a determination of the reasonable costs Fortune incurred in completing construction,[9] the amount of unpaid contract balances at the time of Arkin's default, and the amount of payment bond claims paid by National Fire. The district court instructed the jury to this effect, incorporating several of the court's prior rulings.[10]

---

[8]Because National Fire did not pursue its assignment claim, the district court granted Fortune judgment as a matter of law as to that claim.

[9]The district court instructed the jury that, in making this determination, the jury was not to include unreasonable costs Fortune could have avoided, costs related to correcting design defects, the liquidated delay damages, costs for electrical overages, and the Davis-Bacon wage claims. (R.133 at 9, 10, 12.)

[10]Specifically, the district court instructed the jury:
The Court has found, as a matter of law, that National Fire has a right to recoup payments it made under the payment bonds from the unpaid balance of the subcontract. This right is superior to Fortune's right to apply the unpaid balance of the subcontract to claims that it might have against Arkin. The Court having so determined, this issue is not for your consideration.

The jury returned a verdict in favor of National Fire, finding that contract balances remained on both projects after the deduction of Fortune's reasonable costs to complete construction,[11] and awarded National Fire $255,774 as to the West Brickell

> The Court has also previously determined that, at this juncture, the reasonable costs of completing construction are to be credited against the contract balance....[T]o the extent the contract balance exceeds the reasonable costs of completing construction, the excess is to be paid to National Fire up to the amount of National Fire's payment bond expenditures.
>
> ***
>
> In determining the reasonable cost to complete the projects, the Court has previously determined that certain damages and consequential post default costs that may have been incurred by Fortune must not be considered part of the reasonable cost to complete the projects and may not be assessed against National Fire. These include: (1) delay damages, including liquidated damages specified in the Arkin subcontracts; (2) damages relating to Fortune's electrical overage claim; (3) damages relating to Fortune's Davis-Bacon Act claim. While these items may constitute proper claims against Arkin, they are not to be considered part of the reasonable cost to complete the projects and may not be applied against National Fire.
>
> ***
>
> In determining whether National Fire breached the performance bond, you must accept that the Court has previously determined that National Fire had no obligation to complete the project itself or to tender a completion contractor. Rather, National Fire's only performance bond obligation is to pay any excess, should it exist, of the reasonable cost to complete by Fortune over the contract balance at the time of default by Arkin.
>
> (R.133 at 7, 12, 20).

[11]Part of the jury's consideration in awarding National Fire damages was the determination of the reasonable costs of completion. However, the verdict form did not require the jury to make a specific finding as to the reasonable completion costs

11

project and $336,896.28 as to the Winston Park project, to which the district court added prejudgment interest. This appeal followed.

## II.   STANDARD OF REVIEW

The standard of review for a district court's rulings on motions for summary judgment is <u>de</u> <u>novo</u>, and an appellate court is to apply the same legal standards that bound the district court. <u>See</u> <u>Sarfati v. Wood Holly Assocs.</u>, 874 F.2d 1523, 1525 (11th Cir. 1989); <u>Carlin Communication Inc. v. Southern Bell Tel. & Tel. Co.</u>, 802 F.2d 1352, 1356 (11th Cir. 1986). Likewise, <u>de</u> <u>novo</u> review is appropriate when addressing the construction of written contracts. <u>See</u> <u>Securities & Exchange Comm'n v. Elliott</u>, 953 F.2d 1560, 1582 (11th Cir. 1992). A jury's verdict is reviewed for sufficiency of the evidence and will not be overturned unless no rational trier of fact could have reached the same conclusion based upon the evidence in the record. <u>See</u> <u>Quick v. Peoples Bank of Cullman County</u>, 993 F.2d 793, 798 (11th Cir. 1993).

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

---

or as to the contract balances remaining before deductions. Instead, the jury merely calculated the remaining contract balances <u>after</u> reasonable completion costs and other costs were deducted. We have labored to try to infer the completion costs and remaining balances in light of the jury's verdict, but we have been unable to do so.

12

the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986); see also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. See Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

We review a district court's grant of judgment as a matter of law de novo, evaluating "whether such sufficient conflicts exist in the evidence to necessitate submitting the matter to the jury or whether the evidence is so weighted in favor of one side that one party must prevail as a matter of law." Thosteson v. United States, 304 F.3d 1312, 1316 (11th Cir. 2002). The evidence is evaluated in the light most favorable to the non-moving party. Id.

## III.    DISCUSSION

### A.    Equitable Subrogation and Entitlement to Set-Off

13

The major issue raised in this appeal is National Fire's equitable subrogation rights under the two performance bonds and the two payment bonds. National Fire asserts that it possesses a superior right to the unpaid contract balances in light of a surety's recognized right to equitable subrogation.[12] The District Court agreed and ruled below that National Fire had superior equitable subrogation rights under both its payment and its performance bonds. However, Fortune argues that the liquidated delay damages, Davis-Bacon Act violations, and the electrical overage costs incurred by Arkin should be set off against any unpaid contract balances that National Fire is claiming through equitable subrogation.

Fortune relies primarily upon United States v. Munsey Trust Co., 332 U.S. 234, 236, 67 S. Ct. 1599, 1600, 91 L. Ed. 2022, 2023 (1947), in which the Supreme Court of the United States addressed the issue of "whether percentages retained pursuant to contract by the United States may be subjected to its set-off claims despite the claims

_____

[12]Fortune contends that equitable subrogation is not appropriate because National Fire did not complete, pursuant to its performance bonds, either the West Brickell or the Winston Park projects, and issues of fact exist concerning whether National Fire paid all of its payment bond obligations. See Affidavit of Michael J. Getz (listing unpaid subcontractors, laborers, and materialmen) (R.44.) From the record, it appears that one sub-subcontractor, Aurora Plumbing Corp., was pursuing a payment claim in state court at the time of trial. (R.149 at 55-59.) National Fire, however, represents that it fully satisfied its payment obligations by paying over $1.4 million in payment bond claims, which amounted to every claim timely submitted. For purposes of this appeal, we have assumed that the district court has resolved all factual issues with respect to the payment bond claims.

14

of a surety who has paid laborers and materialmen." In <u>Munsey Trust</u>, the Government had entered into six contracts with a contractor to paint and repair certain federal buildings. Each contract was subject to both a performance bond and a payment bond. Although the contractor completed the work on the contracts so that the surety did not have to perform under the performance bond, the surety did pay $13,065.93 on payment bond claims made by laborers and materialmen. Under the terms of the contracts, the Government had retained percentages of the progress payments due to the contractor, amounting to $12,445.03. Subsequently, the same contractor submitted a bid to the Government for another project, which the Government accepted. However, the contractor failed to enter into a contract for the work, and another contractor performed the job at a price considerably higher than the bid price accepted by the Government, which resulted in damages to the Government in the amount of $6,731.50. In paying over the contract amount that it had retained on the other six contracts to the surety, the Government set off the $6,731.50 it claimed. The surety protested the set-off and asserted its right to an additional $3,568.23. <u>See</u> <u>id.</u> at 332 U.S. 237-39, 67 S. Ct. at 1600-01.

With respect to any claims that may have been asserted by the contractor against the Government, the Supreme Court recognized that "[t]he government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of

15

his debtor, in his hands, in extinguishment of the debts due to him.'" Id. at 239, 67 S. Ct. at 1602 (quoting Gratiot v. United States, 40 U.S. 336, 370, 10 L. Ed. 759 (1841)). However, the surety argued that it had subrogation rights superior to both the laborers and materialmen to whom the surety had paid and to the Government, the bond obligee. In response to this argument, the Supreme Court observed that:

> [O]ne whose own appropriation and payment of money is necessary to create a fund for general creditors is not a general creditor. He is not compelled to lessen his own chance of recovering what is due him by setting up a fund undiminished by his claim, so that others may share it with him. In fact, he is the best of secured creditors; his security is his own justified refusal to pay what he owes until he is paid what is due him.

Id. at 332 U.S. 240, 67 S. Ct. at 1602 (emphasis added). Therefore, the Court held that the Government could set off the amount it claimed. See also United States ex rel. P.J. Keating Co. v. Warren Corp., 805 F.2d 449, 452 (1st Cir. 1986) (recognizing that "Government's set off right is superior to a claim by a Miller Act surety under its payment bond to the same contract earnings"); Marriott Corp. v. Dasto Constr. Co., 26 F.3d 1057, 1070-71 (11th Cir. 1994) (recognizing owner's right to set-off against unpaid contract balance).

National Fire relies on the subsequent Supreme Court decision in Pearlman v. Reliance Ins. Co., 371 U.S. 132, 83 S. Ct. 232, 9 L. Ed. 2d 190 (1962), in which the Court addressed the issue of whether a government contractor's trustee in bankruptcy

16

or the contractor's payment bond surety had the superior right to a fund withheld by the Government out of earnings due to the contractor. The Court recognized the clearly established right of subrogation, which provides that "a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed," and held for the surety. Id., 371 U.S. at 137, 83 S. Ct. at 235. The Supreme Court also noted that the Munsey Trust decision had no effect upon its prior holdings in Prairie State Bank v. United States, 164 U.S. 227, 17 S. Ct. 142, 41 L. Ed. 412 (1896), and Henningsen v. United States Fid. & Guar. Co., 208 U.S. 404, 28 S. Ct. 389, 52 L. Ed. 547 (1908), that "there is a security interest in a withheld fund . . . to which the surety is subrogated." Pearlman, supra, 371 U.S. at 137, 83 S. Ct. at 235. The Supreme Court construed Munsey Trust as limited to the narrow proposition that "the Government could exercise the well-established common-law right of debtors to offset claims of their own against their creditors." Id. at 140, 83 S. Ct. at 237. Otherwise, the equitable rights of a surety to subrogation were left undisturbed. See id. Therefore, the surety had a superior right, vis-a-vis the principal's trustee in bankruptcy, to funds held by the Government. Pearlman did not involve the priority of rights between a surety and the obligee.

We note that neither Munsey Trust nor Pearlman attempted to differentiate the surety's equitable subrogation rights on the basis of whether a payment or a

17

performance bond obligation had been fulfilled. Under Florida law, which applies here, a performance and payment bond surety's rights to equitable subrogation depend upon the nature of the obligation fulfilled by the surety under the terms of the bonds. In Transamerica Ins. Co. v. Barnett Bank of Marion County, 540 So. 2d 113, 115 (Fla. 1989), the Supreme Court of Florida addressed the issue of "whether a surety's equitable subrogation rights are limited to rights it obtains by standing in the shoes of the defaulting contractor. " In considering this issue, the court observed:

> [T]he surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety – who may have had liens; and, not least, in the shoes of the [obligee], for whom the job was completed.

Id. at 115-16 (quoting National Shawmut Bank v. New Amsterdam Cas. Co., 411 F.2d 843, 844-45 (1st Cir. 1969)). Therefore, "[a] surety who performs or pays on behalf of a [*sic*] obligee steps into the shoes of the obligee to the extent of performance or payment." Id. at 116 (emphasis added). Thus, only a performance and payment bond surety who pays all of the bills of the job to date and completes the job is entitled to stand in the contractor-principal's shoes and demand payment of unpaid balances from the obligee. The surety's rights, "as subrogee, are not inferior even to the rights of the obligee and may be asserted against the obligee." Id. The Transamerica opinion of

18

the Supreme Court of Florida recognizes that a performing surety may assert a right to contract proceeds superior to the obligee because, <u>by completing the project</u>, the surety conferred a benefit on the obligee and, therefore, stepped into the shoes of the obligee. <u>See</u> <u>id.</u> at 115-16. Where a surety pays the claims of laborers and materialmen, the surety is only entitled to stand in the shoes of those laborers and materialmen who might have had liens, "but for" the surety's payment. Of course, in both cases, the surety's subrogation rights exist only to the extent of the surety's performance. The fact that the surety in this case, National Fire, did not complete performance distinguishes this case from <u>Transamerica</u>.[13]

We conclude that National Fire's right to subrogation is controlled by the rationale of the former Fifth Circuit's decision in <u>Trinity Universal Ins. Co. v. United States</u>, 382 F.2d 317 (5th Cir. 1967).[14] In <u>Trinity Universal</u>, the former Fifth Circuit addressed "whether, when a Miller Act surety completes a defaulted contract pursuant

---

[13]"'Subrogation rights place a party . . . in the legal position of one who has been paid money because of the acts of a third party. Thus, the subrogee 'stands in the shoes' of the subrogor and is entitled to all of the rights of its subrogor, but also suffers all of the liabilities to which the subrogor would be subject.'" <u>Cleary Bros. Constr. Co. v. Upper Keys Marine Constr., Inc.</u>, 526 So. 2d 116, 117 (Fla. 3d DCA 1988) (quoting <u>Allstate Ins. Co. v. Metropolitan Dade County</u>, 436 So. 2d 976, 978 (Fla. 3d DCA 1983)).

[14]The Eleventh Circuit has adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981. <u>See</u> <u>Bonner v. Prichard</u>, 661 F.2d 1206 (11th Cir.1981).

to its performance bond, the government may set off taxes owed by the contractor against the surety's claim to the fund retained by the government to insure performance." Id. at 318.  Finding that there was no right to set-off, the former Fifth Circuit recognized that, in Munsey Trust, the rights of the surety were limited to those of subrogee of the contractor because the surety had only performed under a payment bond. Id. at 319.  Having made payments pursuant to its payment bond, the surety in Munsey Trust became a creditor of the Government with respect to the funds retained by the Government, and the Government could exercise the well-established common law right to set-off claims against its creditors.  Id. at 319-20.

However, the former Fifth Circuit noted that, "[a] different situation occurs when the surety completes the performance of a contract.  The surety is not only a subrogee of the contractor, and therefore a creditor, but also a subrogee of the government and entitled to any rights the government has to the retained funds." Id. at 320.  The distinction between a surety's rights when performing under a payment bond or a performance bond is important.  When a surety completes the project itself or pays the excess completion costs pursuant to the performance bond, the surety confers a benefit upon the obligee, whether the obligee is the Government or a private entity.  That benefit relieves the obligee of the burden of completing the construction. In such circumstances, an implicit agreement exists that the surety has a right to all

retained funds and any remaining progress sums, and the obligee does not possess a right to set-off.[15]  See id. at 320-21; see also Aetna Cas. & Surety Co. v. United States, 435 F.2d 1082, 1083-84 (5th Cir. 1970) (finding that surety's payments made under performance bond were not subject to set-off).

Courts often fail to address the distinction between a surety's right to subrogation when the surety makes payments under a payment bond, as compared to the surety's rights when it performs its performance bond obligations.  The payment bond surety, who stands in the shoes of laborers and materialmen, normally has priority with respect to remaining contract balances because those laborers and materialmen would have high priority liens against the property under state law.

---

[15]In Dependable Ins. Co. v. United States, 846 F.2d 65 (Fed. Cir. 1988), the Federal Circuit also recognized that a surety's subrogation rights, with respect to set-offs asserted by the Government, vary depending upon whether the surety performed under a performance bond or a payment bond.  In that case, the surety acknowledged that, under Munsey Trust, "the government's right to retained contract proceeds are generally superior to those of a payment bond surety."  Id. at 67.  The Federal Circuit further explained why performing performance bond sureties have superior rights to the obligee, while payment bond sureties do not:

> [W]hen a surety finances completion of a project, it confers a benefit upon the government by relieving it of the task of completing performance itself.  It therefore becomes subrogated not only to the rights of the prime contractor but to those of the government.  Accordingly, a completing performance bond surety has the right to accumulated contract proceeds free from setoff by the government.

Id. at 67.

Under Florida law, construction liens of laborers and materialmen have priority over all subsequently recorded encumbrances on the owner's property. Fla. Stat. § 713.07(3) (1997). Of course, the payment bond surety's subrogation is limited to proper payments made to valid lien claimants. Likewise, the performance bond surety who actually performs stands in the principal's shoes and can demand payment of the remaining contract balances. Further, such a performance bond surety's rights to contract balances are superior to the obligee's and any claims the obligee may have against the principal. Where, as in this case, the surety makes payments under the payment bonds, but does not fulfill its performance bond obligations, this distinction is critical to an equitable prioritization of rights, particularly where it is the obligee who performs in the face of the surety's possible breach of the performance bond.

The rationale of Trinity Universal controls the respective rights of National Fire and Fortune to any retained contract balances in Fortune's possession. To further analyze the surety's subrogation rights, it is necessary to differentiate between what claims are covered by each of the respective bonds. Since National Fire did not complete construction under its performance bonds, it has acquired equitable subrogation rights only with respect to its payment bonds. The district court erred to the extent that it granted summary judgment for National Fire on its claim of equitable subrogation arising out of the performance bonds. Further, the extent of National

22

Fire's subrogation under the payment bonds to Fortune is limited to the amount of the valid claims National Fire properly paid on a particular project <u>after</u> Fortune's reasonable costs to complete construction on the project are deducted from the remaining contract balances.

Our holding that National Fire is not entitled to equitable subrogation for any performance bond related claims is also based upon our conclusion that the district court erred in its partial summary judgment ruling that National Fire had no obligation under the performance bonds for either project to complete construction itself or to arrange for the completion of construction.[16] Such a ruling would have been correct if the bonds were indemnity-type, but it is undisputed in the record that the performance bonds in this case were not merely indemnity bonds. The touchstone of any right to subrogation under a performance bond is actual and full performance of

---

[16]National Fire could not, as the district court ruled, simply "do nothing" and pay for any excess construction costs. As noted in one treatise:

> The seductive enticement of the 'do nothing' option to the surety is avoiding the immediate cost of completion, but this course of action remains advantageous only if the surety is correct in its analysis that it has no liability to the obligee....Some bond forms remove the surety's 'do nothing' option. These instruments require the surety to act. If the surety believes it has a defense, it may reserve its rights and litigate -- but it must perform.

Phil Bruner & Patrick O'Connor, 4 BRUNER & O'CONNOR ON CONSTRUCTION LAW § 12:82 n.5 (2002), WL BOCL § 12:82.

the bond's obligations. RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 27

(1995). The language of the two performance bonds plainly contravenes the district

court's ruling. The Winston Park performance bond provided that:

> Whenever [Arkin] shall be, and declared by [Fortune] to be in default under the [Winston Park Subcontract], [Fortune] having performed [Fortune's] obligations thereunder, [National Fire] may promptly remedy the default, or shall promptly
>
> 1) Complete the [Winston Park Subcontract] in accordance with its terms and conditions, or
>
> 2) Obtain a bid or bids for completing the [Winston Park Subcontract] in accordance with its terms and conditions, and upon determination by [National Fire] of the lowest responsible bidder, or if [Fortune] elects, upon determination by [Fortune] and [National Fire] jointly of the lowest responsible bidder, arrange for a contract between such bidder and [Fortune], and make available as Work progresses...sufficient funds to pay the cost of completion less the balance of the contract price; but not exceeding, including other costs and damages for which [National Fire] may be liable hereunder, the amount [of the bond].

Under the terms of this bond, when Arkin was declared in default, National Fire had

three options: (1) it could remedy the default; (2) it could complete construction itself;

or (3) it could arrange for the completion of construction by selecting, either by itself

or jointly with Fortune, a completion contractor and by making funds available to the

completion contractor for completion costs in excess of the contract price. National

24

Fire could not, as the district court held, merely ignore Fortune's demands that National Fire perform, force Fortune to complete construction, and then pay Fortune for reasonable costs in excess of the contract price. The express terms of the Winston Park performance bond placed the burden of performance on National Fire. Because National Fire did not perform, it is not entitled to subrogation with respect to the Winston Park performance bond.

The district court also erred in applying the same analysis to National Fire's West Brickell performance bond obligation as to the Winston Park performance bond obligation. Unlike the Winston Park performance bond, the West Brickell performance bond's terms potentially contemplated completion of construction by Fortune. The West Brickell performance bond stated:

> Whenever [Arkin] shall be, and be declared by [Fortune] to be in default under the subcontract, [Fortune] having performed [Fortune's] obligations thereunder:
>
> (1) [National Fire] may promptly remedy the default subject to the provisions of paragraph 3 herein; or
>
> (2) [Fortune] after reasonable notice to [National Fire] may, or [National Fire] upon demand of [Fortune] may arrange for the performance of [Arkin's] obligation under the subcontract subject to the provisions of paragraph 3 herein;
>
> (3) The balance of the subcontract price ... shall be credited against the reasonable cost of completing performance of the subcontract. <u>If completed by [Fortune], and the reasonable cost exceeds the balance of the subcontract</u>

25

> price, [National Fire] shall pay to [Fortune] such excess, <u>but in no event shall the aggregate liability of [National Fire] exceed the amount of this bond.</u>

(Emphasis added).

Under this provision, National Fire also had three alternatives: (1) it could remedy the default; (2) if Fortune provided National Fire reasonable notice that Fortune wished to arrange for completion, it could allow Fortune to arrange for the completion of construction; or (3) if Fortune demanded that National Fire arrange for completion of construction, it could arrange for completion of construction itself. According to the evidence in the record (and construing the record in the light most favorable to Fortune since it appears to be a genuine factual dispute), Fortune did not wish to complete construction of the West Brickell project itself after Arkin defaulted. Instead, Fortune demanded that National Fire arrange for completion of construction of the West Brickell project, and National Fire refused to do so. Paragraph three of the West Brickell performance bond does contemplate the possibility that Fortune could have completed the subcontract itself. However, this contingency would only occur if, under the second alternative, Fortune sought to complete construction itself or, under the third alternative, National Fire arranged for Fortune to complete construction. In either of these cases, Fortune (not National Fire) could choose whether Fortune would voluntarily complete construction. Because it appears National Fire did not perform, it is not entitled to subrogation with respect to the West

26

Brickell performance bond.

We also find that disputed issues of material fact exist in the record about whether National Fire's failure to perform amounted to a breach of its performance bond obligations, as described above. National Fire claims it appropriately tendered a completion contractor and that Fortune refused this tender. (Aff. of Raymond Lemming, R.27 at 4-5.) Fortune claims a completion contractor was never tendered despite its demands. (Aff. of Michael Getz, R.44 at 2.) This obvious factual conflict was presented to the district court in the parties' arguments on National Fire's motions for partial summary judgment. The only way the district court avoided confronting this conflict was by erroneously ruling that, as a matter of law and without reference to the language of the performance bonds, National Fire had no obligation to tender a completion contractor or to complete performance itself. Summary judgment on Fortune's breach of contract claim against National Fire was improper and we remand for further proceedings on this issue.[17]

B.     Fortune's Setoff Claims

Having concluded that National Fire is only entitled to equitable subrogation

---

[17]Determination of the factual dispute about whether National Fire actually breached the performance bonds is unnecessary to our ruling on National Fire's claim of equitable subrogation. It is undisputed that National Fire did not, in fact, complete construction, and for that reason National Fire cannot claim subrogation under the performance bonds.

with respect to valid payments made under its payment bonds, and that Fortune is entitled to a setoff for all items encompassed within the scope of the performance bonds, we now must consider the specific claims for which Fortune seeks setoff.

1.  Liquidated Delay Damages

Fortune contends that National Fire is responsible for liquidated delay damages that had accrued prior to Arkin's default due to Arkin's failure to timely perform on both projects. Although Fortune obtained judgment as a matter of law against Arkin for these damages, Fortune seeks to set these damages off against the retained contract balances. Fortune also argues that National Fire is contractually liable for these damages because the bonds incorporated by reference the underlying subcontracts which expressly provided for delay damages. However, National Fire denies any responsibility for delay damages, arguing that such damages are unrelated to the completion of the bonded construction projects and that the performance bonds do not expressly recognize liability for delay damages.

We look to Florida law to see what a surety's obligations are in the circumstances of this case. As a general proposition, the true performance bond requires a surety to guarantee the performance through completion of the underlying contract. See Federal Ins. Co. v. Southwest Fla. Retirement Ctr., Inc., 707 So. 2d 1119, 1121 (Fla. 1998). However, in American Home Assurance Co. v. Larkin

28

General Hospital, Ltd., 593 So. 2d 195 (Fla. 1992), the Supreme Court of Florida held that "a surety cannot be held liable for delay damages due to the contractor's default unless the bond specifically provides coverage for delay damages." Id. 593 So. 2d at 196 (footnote omitted). In Larkin General Hospital, the contractor had not substantially completed the project by the target date, but the owner did not declare the contractor in default. Nearly eighteen months later, after a dispute arose between the owner and contractor, the owner declared the contractor in default and notified the surety. The surety elected not to complete performance and the owner used another contractor to complete the job. In the owner's action against the surety for breach of the performance bond, the trial court included in its damage award the owner's consequential delay damages for the contractor's tardy performance. Importantly for purposes of our analysis, there was no liquidated or other type of damages provision in the underlying contract. The Larkin General Hospital court noted:

> [t]he purpose of a performance bond is to guarantee the completion of the contract upon default by the contractor. Ordinarily a performance bond only ensures the completion of the contract. The surety agrees to complete the construction or to pay the obligee the reasonable costs of completion if the contractor defaults.

Id. at 198 (citations omitted). Although a surety's liability is coextensive with that of the principal, "the surety's liability for damages is limited by the terms of the bond." Id. Therefore, the Supreme Court of Florida found that "[t]he language in the

29

performance bond, <u>construed together with the purpose of the bond</u>, clearly explains that the performance bond merely guaranteed the completion of the construction contract and nothing more." <u>Id.</u> (emphasis added); <u>see</u> <u>also</u> <u>Mycon Constr. Corp. v. Board of Regents</u>, 755 So. 2d 154, 155 (4th DCA 2000) ("Because the performance bond contains no provision for damages for delay, the surety cannot be held liable for such damages."). However, unlike the performance bond in <u>Larkin General Hospital</u>, the bonds at issue in this case expressly incorporated the subcontracts, which, in turn, do expressly provide for liquidated delay damages.

<u>Larkin General Hospital</u> could possibly be interpreted to mean that a performance bond surety cannot be held liable for, or denied subrogation for, delay damages, whether liquidated or unliquidated, unless the responsibility for delay damages is specified on the face of the performance bond. However, we do not read the decision that broadly.[18] The "purpose of the bond" must be considered, which requires reference to the contract secured by the bond. Where a provision for liquidated delay damages is clearly delineated in the underlying contract and incorporated by reference into the bond, the surety is on notice of the time element of performance and the contractual consequences of failure to timely perform in

---

[18]The Supreme Court of Florida has since declined to extend <u>Larkin General Hospital</u> beyond delay damages. <u>Federal Ins. Co. v. Southwest Fla. Retirement Ctr.</u>, 707 So. 2d 1119, 1121 (Fla. 1998).

accordance with the contract. Once the liquidated damages accrue, the contractor-principal owes a debt to the obligee which is, in effect, a reduction of (or contractual off-set to) the contract price. In such event, the obligee becomes the creditor of the principal and the performance bond surety should not have superior rights to the obligee in the remaining contract balances where liquidated damages have been suffered. This is especially true where, as here, the surety does not remedy the principal's delay by performing the surety's obligations under the performance bond.

While it is true that the terms of the bonds in this case do not expressly require the surety to assume responsibility for delay, "[i]t is the general rule of contract law that where a writing expressly refers to and sufficiently describes another document, the other document is to be interpreted as part of the writing." Lord & Son Constr., Inc. v. Roberts Electrical Contractors, Inc., 624 So. 2d 376, 377 n.2 (Fla. 1st DCA 1993). Even after Larkin General Hospital, Florida courts have continued to utilize the well-established doctrine of incorporation by reference to impose liability on a performance bond surety. See DCC Constructors, Inc. v. Randall Mech. Inc., 791 So. 2d 575, 576-77 (Fla. 5th DCA 2001); Southwest Fla. Retirement Ctr. v. Fed Ins. Co., 682 So. 2d 1132-33 (Fla. 2d DCA 1996), aff'd, 707 So. 2d 1119 (Fla. 1998). The "purpose" of the performance bonds was to insure performance in accordance with the terms of the respective subcontracts, and those terms plainly include adverse direct

consequences for delay. Therefore, under the particular facts of this case, the unequivocal delay damages provisions of the subcontracts are properly considered part of the bonds issued by National Fire because of the incorporation by reference. Moreover, the liquidated delay damages are properly considered part of the performance of the subcontracts, and it is undisputed that Fortune completed the projects, with no performance-related costs being incurred or paid by National Fire. Accordingly, Fortune's claim for set-off of the delay damages is entitled to priority over National Fire with respect to any of National Fire's claims related to the performance bonds.

However, Fortune's claim for delay damage set-off is not entitled to priority over National Fire's valid payment bond claims. A performing payment bond surety stands in the shoes of the laborers and materialmen who might have had liens on the property. That right is generally superior to the rights of either the principal or the obligee. To the extent of the payment bond claims actually and properly paid, National Fire's right to any unpaid contract balances is superior to Fortune's liquidated delay damages claim.[19] We express no opinion about whether National Fire may be responsible for delay damages related to Fortune's breach of contract claims

---

[19]It is not clear from the record, but it appears that National Fire's payment bond equitable subrogation claims may exhaust the contract balances retained by Fortune.

on the performance bonds.

2.     Davis-Bacon Wages

The district court granted National Fire partial summary judgment on Fortune's counterclaim for set-off of the amount of back wages Fortune paid due to violations of the Davis-Bacon Act by one of Arkin's subcontractors on the West Brickell Project. The Davis-Bacon Act requires laborers on federally funded projects to be paid not less than the "prevailing" wages in the locale.  See 40 U.S.C. § 276a(a); Walsh v. Schlecht, 429 U.S. 401, 411, 97 S. Ct. 679, 686, 50 L. Ed. 2d 641 (1977).  The Act requires that "every contract based upon these specifications shall contain a stipulation that the contractor or his subcontractor shall pay all mechanics and laborers" the federally mandated wages.  40 U.S.C. § 276a(a) (emphasis added).  Federal regulations applicable to contracts and subcontracts under the Davis-Bacon Act provide, "The prime contractor shall be responsible for the compliance by any subcontractor or lower tier subcontractor...."  29 C.F.R. § 5.5(a)(6) (1999).

We conclude that the Davis-Bacon wages paid by Fortune are part of Fortune's reasonable cost of completion of construction.[20]  The Davis-Bacon wage claims paid

_____

[20]One could evaluate Fortune's Davis-Bacon Act claim, as Fortune suggests, as part of National Fire's performance bond obligation because the West Brickell performance bond specifically incorporated by reference the West Brickell Subcontract which imposed on Arkin the responsibility for Arkin's subcontractors' acts and omissions.  However, we think the Davis-Bacon Act wages are properly

by Fortune represent wages of laborers on the West Brickell project that should have properly been paid as part of the costs of construction. Because of Arkin's failure to properly supervise Allied's compliance with the Davis-Bacon Act, as Arkin was required to do under the West Brickell Subcontract, federal funds payable to Fortune, as general contractor, for the West Brickell project sufficient to pay Allied's employees could have been withheld. 40 U.S.C. § 276a-2(a). If the remaining federal funds were insufficient to repay the employees, the Davis-Bacon Act gave Allied's employees the right to file a lien on the West Brickell property for the difference. 40 U.S.C. § 276a-2(b); Fla. Stat. § 713.03. We reverse the district court's grant of partial summary judgment to National Fire on this issue and hold that Fortune has a right to set off its $71,126.00 Davis-Bacon Act claim against the remaining contract balances

---

considered costs of construction because they represent wages that should have properly been paid, and were paid, through enforcement by the Department of Labor, to the laborers on the West Brickell project. Such wages were a part of the cost of completion.

These wages could also be considered as being within National Fire's payment bond obligation, but because of unique language in the West Brickell payment bond, the Davis-Bacon wage claims escape coverage under the bond. National Fire was only obligated under the West Brickell payment bond to make payments to valid "claimants", defined as those persons having a "direct contract" with Arkin. The Davis-Bacon wage claimants were employees of Allied who did not technically have a "direct contract" with Arkin.

as part of Fortune's reasonable costs of completion.[21]

### 3. Electrical Overages

Fortune also claims the Fortune-Arkin letter agreement gives Fortune a right to payment from National Fire for the electrical overages Fortune paid on the West Brickell project. However, the West Brickell performance bond cannot be construed to cover an agreement that was not identified in the West Brickell Subcontract.[22] The

---

[21]The parties also have raised an issue concerning whether public policy favors holding either the principal contractor or a subcontractor's surety responsible for ensuring payment of Davis-Bacon wages. As discussed earlier, Fortune is required by law, as well as by public policy, to ensure compliance by its subcontractors with the Davis-Bacon Act. See 40 U.S.C. §276a; 29 C.F.R. §5.5(a)(6). Fortune satisfied this responsibility in the West Brickell Subcontract, which was incorporated by National Fire's performance bond, by requiring Arkin to be responsible for the acts and omissions of its subcontractors. We first note that Fortune actually paid the Department of Labor's Davis-Bacon Act claim for restitution. Fortune only seeks reimbursement from Arkin and National Fire for their failure to pay the claim when requested to do so. Moreover, in the West Brickell performance bond, National Fire necessarily accepted the risk that its principal, Arkin, would not fulfill these obligations imposed upon it by the Act and its subcontracts. As a result, we conclude that the policy behind the Davis-Bacon Act will not be frustrated by allowing Fortune to recover this amount as a part of its reasonable costs of completion.

[22]According to Fortune, the letter agreement dated January 15, 1996, is included in the bonded West Brickell Subcontract as evidenced by the fact that National Fire admitted its inclusion in its Answer to Fortune's counterclaim. At oral argument, counsel for Fortune indicated that this admission by National Fire had not been brought to the trial judge's attention prior to the granting of summary judgment against Fortune. Counsel for National Fire indicated that the admission was inadvertent. It appears that National Fire did erroneously admit that this agreement was part of the bonded subcontract, but we do not believe that this inadvertent admission should control liability for these overage costs when it was not considered

35

West Brickell performance bond specifically incorporated the West Brickell Subcontract by reference. The list of "Contract Documents" identified in the West Brickell Subcontract, which sets forth the documents that are part of the bonded subcontract, does not include the letter agreement. The subcontract made no other reference to the letter agreement, even though the parties made several other handwritten alterations to the subcontract. Merger and integration provisions in both the "Contract Documents" section and in Article 17 of the subcontract provide that the referenced documents are the entire and complete agreement of the parties. Since the bond was issued on the subcontract without reference to the letter agreement, the letter agreement is not within the scope of contract work that National Fire agreed to insure when it issued the bond. Further, the district court properly rejected Fortune's offer of parol evidence that the letter agreement was part of the subcontract because Fortune produced no evidence that National Fire knew of the letter agreement at the time it issued the bond. Therefore, Fortune has no right to payment for electrical overages from National Fire and the district court properly granted summary judgment in favor of National Fire on this issue.

C. Remaining Issues

1. National Fire's Breach of Contract Claim

_____

by the district court.

Fortune argues that National Fire's breach of contract claim should not have been submitted to the jury because Fortune was not a signatory to the performance bonds on which the claim was based. National Fire asserts that the terms of the bond obligated Fortune to pay National Fire the balance of the proceeds of the Fortune-Arkin subcontract after Fortune completed construction. The terms of the bonds plainly contradict National Fire's argument. Normally, bond agreements create duties that run from the surety to the obligee. The obligee is a beneficiary of the agreement between surety and principal. While there may possibly be some circumstances under which a bond's terms might impose duties on the obligee, Fortune was merely a beneficiary of the performance bonds here.[23] As discussed above, bonds are to be interpreted according to ordinary principles of contract construction. American Home Assurance Co. v. Larkin Gen. Hosp., Ltd., 593 So. 2d at 195, 197 (Fla. 1992); Restatement (Third) of Suretyship & Guaranty §§ 17(2), 32(1) (1995).

In the event that Arkin defaulted, under the terms of both performance bonds National Fire could complete construction itself or agree with Fortune to jointly select another contractor to finish construction, which could possibly be Fortune if the parties so agreed. If the latter occurred, the performance bonds obligated National

---

[23]Even if the agreement imposed duties on Fortune, we find it difficult to understand how a principal and surety could bind an obligee to perform those duties without expressly obtaining the obligee's consent.

37

Fire to make available funds for the completion of construction to the extent the costs exceeded the balance of the contract price. This provision does not require Fortune to tender to National Fire the remaining contract price if Fortune completed construction at a cost less than the contract price. Our interpretation of the bonds' terms is consistent with the surety's traditional duty to complete construction in the event of the principal's default. The purpose of a performance bond is to assure the obligee that construction will be completed and that it will not be liable for construction costs in excess of the contract price in the event the contractor defaults. If National Fire had completed construction, it would have been entitled to payment of the contract price, or under equitable subrogation, entitled to the remaining contract balances held by Fortune. However, National Fire did not complete construction under the bond's terms. Instead, Fortune completed construction and, luckily for National Fire, at a cost less than the contract price. Under no reasonable construction of the performance bonds' terms can a contractual duty be found for Fortune to pay National Fire the remaining balance after Fortune completed construction. Therefore, the district court erred in allowing National Fire's breach of contract claim to be submitted to the jury. Further, even if (as National Fire claims) Fortune did prevent National Fire from completing construction by refusing to accept National Fire's tender of a completion contractor, National Fire could only assert this fact as an

38

affirmative defense that its liability under the performance bonds was discharged, not as a breach of contract claim against Fortune. See Ins. Co. N. Amer. v. Metro. Dade County, 705 So. 2d 22, 34-35 (Fla. 3d DCA 1997)(obligee's failure to timely notify surety of latent defects discharged surety). See also St. Paul Fire & Marine Ins. Co. v. City of Green River, 93 F. Supp. 2d 1170 (D. Wyo. 2000), aff'd, 2001 WL 369831 (10th Cir. 2001).

2. Prejudgment Interest

Finally, we consider the district court's award of prejudgment interest on the jury's damages verdict in favor of National Fire, retroactive to January 30, 1998. Fortune notes that National Fire did not pay one payment bond claimant on the West Brickell project until March 19, 2001, and last paid a like claimant on the Winston Park project on May 15, 2001. Fortune argues that any equitable subrogation rights did not accrue until those dates, when performance under the bonds was complete. Therefore, Fortune contends that prejudgment interest should have been calculated from those dates on the respective projects, and not over three years earlier.

We agree. Prejudgment interest in an action for breach of contract is allowable from the date the debt is due. See, e.g., Paoli v. Natherson, 732 So. 2d 486, 488 (Fla. 2d DCA 1999). Where the judgment liquidates the plaintiff's damages, the plaintiff is entitled, as a matter of law, to prejudgment interest from the date of that loss. Argonaut Ins. Co. v. May Plumbing Co., 474 So. 2d 212, 215 (Fla. 1985). However,

39

in this case, National Fire's right to equitable subrogation under its payment bonds with respect to the remaining contract balances did not arise until all of its payment bond obligations had been performed. RESTATEMENT (THIRD) OF SURETYSHIP & GUARANTY § 27 (1995). Further, any entitlement to equitable subrogation on the remaining contract balances could not be determined until after Fortune had completed the construction. If, as is usually the case, the cost of completion by Fortune had equaled or exceeded the contract price, there would have been no remaining balances and National Fire would not have been entitled to any equitable subrogation with respect to them. The district court erred when it awarded prejudgment interest on National Fire's equitable subrogation claim prior to the completion of its payment bond obligations.

## IV. CONCLUSION

For the above reasons, the judgment of the district court is AFFIRMED IN PART and REVERSED IN PART and this case is REMANDED for further proceedings consistent with this opinion.