[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 16, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-11074

_____

D. C. Docket No. 05-00320-CV-ORL-22DAB

WASTE SERVICES, INC.,
a Delaware corporation,

Plaintiff-Appellant,
Cross-Appellee,

versus

WASTE MANAGEMENT, INC.,
a Delaware corporation,
WASTE MANAGEMENT OF FLORIDA,
a Florida corporation,

Defendants-Appellees.

MAURICE MYERS,
Individually,

Defendant-Appellee,
Cross-Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(May 16, 2008)**

Before EDMONDSON, Chief Judge, WILSON, Circuit Judge, and MARTINEZ,[*] District Judge.

PER CURIAM:

Plaintiff-Appellant Waste Services, Inc. challenges a decision to award the Defendants-Appellees summary judgment in a suit alleging tortious interference with a prospective business relationship. For the reasons stated below, we affirm the district court's decision to award the appellees summary judgment.

**Background**

Appellant Waste Services, Inc. ("WSI") and appellees Waste Management, Inc. and Waste Management of Florida, Inc. (collectively, "WM") compete for business in the solid waste disposal and recycling industry at both the regional and national level. WM controls the larger share of the nationwide market, and enjoys particular success in Florida where operations generate as much as 10% of WM's total revenue. In 2002, WSI decided to expand its operations into Florida, and began negotiating to purchase the Omni site, a newly permitted landfill in central Florida, which would compete with WM's Okeechobee landfill. WSI alleges that WM tried to prevent it from acquiring the landfill; first by opposing the permitting

---

[*] Honorable Jose E. Martinez, United States District Judge for the Southern District of Florida, sitting by designation.

2

process, and later by attempting to purchase it. Ultimately, however, Omni's owners agreed to sell the Omni site to WSI for a total of approximately $75 million, and WSI signed purchase agreements with the owners on January 14 and 15, 2003.

One agreement was with Donald Moorehead, who owned nearly a quarter interest in the site, and the other was with the "majority owners," who owned the remaining three-quarter interest in the site. Under the terms of these purchase agreements, WSI agreed to pay Moorehead $7.5 million and turn over 1.7 million shares of WSI's common stock by February 13, 2003. Thereafter, WSI would make two payments to the majority owners - one for $30 million on April 1, 2003, followed by a final payment of $27.375 million on January 1, 2004.

Although WSI had an existing credit agreement with a bank group, which included Bank of America ("BOA") and the Canadian Imperial Bank of Commerce "(CIBC"), it needed additional financing to purchase the Omni site. However, WSI's existing credit agreement, or Senior Credit Facility ("SCF"), imposed limits on the corporation's ability to take on new debt, requiring that the Bank Group pre-approve any new loans. Nevertheless, the SCF did contain a provision which would allow WSI to request additional financing or a "greenshoe

3

loan"[1] on the same credit terms that existed in the SCF.

In late 2002, WSI entered into discussions with a Mark Pytosh, a loan representative from Lehman Brothers ("Lehman"), to see whether Lehman might finance a loan for the purchase of the Omni landfill. The financing agreement that began to emerge from these discussions called for Lehman Brothers to provide $10 million in financing with certain conditions. Those conditions were that: (1) BOA and CIBC would agree to approve the Omni purchase, waiving the financial covenants required under the existing SCF, and (2) BOA and CIBC would each ante up an additional $5 million towards the purchase of Omni, providing WSI with an overall loan package of $20 million.

Mark Pytosh, Lehman's loan representative, floated the proposed financing plan by several members of Lehman's loan committee in late 2002 and reported back to WSI that the plan looked promising. BOA and CIBC began to evaluate

---

[1]The Court uses the term "greenshoe loan" to describe the proposal that would allow WSI to request additional financing through Lehman on the terms that applied in the SCF with its existing lenders (BOA, CIBC and other members of its Bank Group) because the parties' appellate briefs consistently characterize the proposed financing plan in these terms. The term may be confusing to some given that a green shoe arrangement is usually used to describe an option to purchase additional equity on equity financing. As Lehman's representative Mark Pytosh explained in his deposition, the arrangement being discussed here relates to a "tack-on" or "shoe" feature that is fairly characteristic of existing credit agreements, although a shoe feature is more of an equity financing option. [D.E. 142-34 at 12]. According to Pytosh, the arrangement being proposed here was analogous to the green shoe arrangement that is used in equity financing. [Id.]. In a green shoe arrangement, underwriters are given an option to purchase additional equity on equity financing. Here, the issuers had an option to issue more senior debt to WSI up to $20 million. WSI's Capital Environmental Bank facility had a tack-on provision, which would allow WSI to draw down $20 million under the existing terms and conditions of its credit facility. [Id.]. According to Pysosh, the greenshoe loan arrangement that began to emerge in discussions between Lehman, BOA and CIBC was that Lehman would commit to finance $10 million for an additional loan and BOA and CIBC would commit to provide the other $10 million allowed under this "tack-on" feature. [Id.].

the proposed plan as well. On February 10, 2003, CIBC sent the other members of WSI's bank group an email that outlined the proposed plan and indicated that Lehman had "agreed to join the Bank Group at the US$10 million level." *See* [R-167-33 at 4-5, CIBC 000349-350]. The email recommended that the bank group amend the SCF, allowing WSI to finance Omni through the proposed "greenshoe" loan package.

Despite these promising developments, Mark Pytosh decided not to present the proposed financing plan to Lehman's loan committees after he heard an unsettling rumor about WSI's CEO and President. Pytosh told WSI that he met with Maurice Myers, who was WM's CEO and President on February 10, 2003, the same day that CIBC sent its email recommending the greenshoe loan package. Myers began discussing WSI's then-CEO and chairman, David Sutherland-Yoest, who had formerly served as a senior executive at WM. According to Pytosh, Myers expressed surprise that Lehman would loan WSI money because he had heard that the Securities and Exchange Commission ("SEC") was going to file civil charges against Sutherland-Yoest. Pytosh noted that he had heard in 1999 that the SEC was investigating WM, which Sutherland-Yoest headed at the time, but Pytosh had not considered that fact particularly significant, until he heard that civil charges might be filed against Sutherland-Yoest, who was now with WSI.

Pytosh told WSI that he could not continue to recommend that Lehman consider financing the greenshoe loan after this.

As a result, WSI was unable to meet the deadline for its first payment on the Omni site, which was due February 15, 2003 or its second payment to the site majority owners on April 1, 2003. Ultimately, WSI was able to renegotiate purchasing terms with the landfill's owners, however, the new terms required that WSI pay Moorehead a higher price for his share of the site, and pay the entire majority owners in cash by May 1, 2003. WSI was forced to raise the cash through a private equity firm, incurring increased financing and transactional costs in the process.

On March 3, 2005, WSI filed a Complaint against WM and Myers, in an effort to recover these increased costs, which WSI estimated at approximately $55 million. WSI's Complaint alleged antitrust claims under both the Sherman Act and Florida law, as well as separate claims for tortious interference in its contractual (purchase) agreements and tortious interference in its prospective business relationship with Lehman.

On October 2, 2006, WM and Myers filed separate motions for summary judgment. WM argued that WSI had failed to establish that Lehman had, in fact, agreed to finance the loan for the Omni purchase. Thus, WM asserted that WSI

6

could not establish one of the key elements for a tortious interference claim - the existence of business relationship under which the plaintiff has legal rights. Myers adopted WM's argument but also asserted that WSI's claims were barred by the statute of limitations. Myers maintained that Texas law should govern this question under Florida's choice of law analysis because the allegedly tortious act occurred in Myers's office in Texas.

WM and Myers also filed a joint *Daubert* motion to strike the expert report and testimony of one of WSI's witnesses, Dr. Charlotte Chamberlain, regarding customary banking practices. Dr. Chamberlain had testified in her deposition that, based upon her knowledge of customary banking practices, BOA and CIBC would have amended the SCF to allow the greenshoe loan. The Defendants urged the district court to exclude this testimony as highly speculative.

On December 1, 2006, the district court granted in part the Defendants' motion to exclude Dr. Chamberlain's testimony regarding the likelihood that BOA and CIBC would have waived WSI's SCF requirements. The district court noted that the challenged testimony was not proper rebuttal testimony as it was presented after the deadline for disclosure of expert witness reports had expired. The district court also noted that the testimony was conjectural and thus, inadmissable under *Daubert* and Rule 403 of the Federal Rules of Evidence.

7

On February 9, 2007, the district court granted the Defendants' motion for summary judgment, citing the arguments advanced by WM, and rejecting Myers's arguments regarding the application of Texas law. On March 8, 2007, WSI filed a Notice of Appeal, arguing that the district court failed to apply the summary judgment standard correctly in evaluating WSI's claim for tortious interference with a business relationship.

WSI insists that there was sufficient evidence in the record to allow a reasonable juror to conclude that WSI did have an actual understanding with Lehman concerning the Omni loan package. Thus, WSI argues that the district court failed to draw all reasonable inferences in favor of WSI as the nonmoving party. WSI argues that the district court compounded this error by applying the wrong standard for tortious interference claims and requiring that WSI show it had an enforceable contract with Lehman. WSI insists that a party who alleges tortious interference under Florida law only has to show that he had an agreement or understanding which would "in all probability" have matured into an enforceable contract but for another party's interference.

WSI also challenges the district court's decision to exclude the expert testimony of Dr. Chamberlain, arguing that the court abused its discretion when it struck the testimony because it came in after the deadline for expert witness

reports had expired.

Maurice Myers filed a conditional cross-appeal, although he adopts the arguments cited by his co-appellee WM. Nevertheless, Myers argues that, in the event this Court reverses the district court on appeal, summary judgment was proper in his case because Texas law supplies the appropriate statute of limitations.

## Standard of Review

We review a district court's grant of summary judgment *de novo*, *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 836 (11th Cir. 2006), and adhere to the same legal standards that bound the district court. *National Fire Insur. Co. of Hartford v. Fortune Const. Co.*, 320 F.3d 1260, 1267 (11th Cir. 2003), *cert. denied*, 540 U.S. 873 (2003).

Rule 56 (c) of the Federal Rules of Civil Procedure provides that a district court should grant summary judgment if the record, including pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, fails to disclose any genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *National Fire Insur. Co.*, 320 F.3d at 1267. The moving party bears the initial burden of proving that no

9

genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As we review the record on a motion of summary judgment, we draw all reasonable inferences that can be sustained by the record and evaluate those inferences in the light most favorable to the non-moving party. *See Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999). However, "we may consider only that evidence which can be reduced to an admissible form." *Rowell v. Bellsouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005).

With respect to decisions that exclude the opinion testimony of expert witnesses, this Court reviews such decisions for abuse of discretion. Accordingly, under this standard, we "defer to the district court's ruling unless it is 'manifestly erroneous.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

## Discussion

The Florida Supreme Court has stated that: "[a]s a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding of an agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc. v. Georgetown Manor, Inc*. 647 So.2d 812, 815 (Fla. 1994). Although the courts will recognize a protected business relationship even though the parties' relationship is based upon a contract that is void or unenforceable,

10

*United Yacht Brokers v. Gillespie*, 377 So.2d 668 (Fla. 1979), nevertheless, "the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights." *Ethan Allen,* 647 So.2d at 814 (quoting *Register v. Pierce*, 530 So. 2d 990, 993 (Fla. 1st DCA 1988))(internal quotation marks omitted); *see Becker Designs, Inc. v. Biker Design, Inc*., No. 6:06-CV-56-ORL-22DAB, 2006 WL 2444075, at *3 (M.D. Fla. Aug. 22, 2006).

Examining the record in terms of this standard, the Court concludes, as the district court did, that WSI and Lehman had yet to reach an understanding that afforded WSI either existing or prospective legal or contractual rights. Accordingly, WSI's tortious interference claim fails to satisfy the requirements for such a claim under Florida law. The business relationship that WSI hoped to have with Lehman never moved beyond the discussion stage. This fact is perfectly clear from the testimony by Mark Pytosh, who served as Lehman's point person during discussions of the proposed greenshoe loan. Significantly, WSI did not controvert Pytosh's testimony.

Pytosh, who later left Lehman to assume the position of CEO for WSI, testified that the tenor of his discussions with WSI were informal and never resulted in a formal financing commitment. [D.E. No. 143-7 at 7]. His role, as he explained it, was to work with potential clients such as WSI to begin to negotiate

11

the circumstances under which Lehman might commit to finance a loan. [D.E. No. 143-5 at 7-8]. However, Pytosh adamantly stated that he had no authority to bind Lehman to a loan proposal, and that any loan proposal would have to be reviewed by Lehman's Loan Participation and Credit committees. [Id.; D.E. No. 142-18 at 11; 143-5 at 7]. Pytosh acknowledged that he had, indeed, floated the loan proposal by several members of the Loan Participation committee, and they indicated that it sounded promising. [D.E. No. 142-17 at 1]. He also admitted that he told WSI that he believed the loan proposal would be approved based upon his experience in making recommendations to Lehman's Loan Participation and Credit committees. [Id.]. However, Pytosh stated that once he learned that the SEC might be filing charges against WSI's CEO, he decided not to bring the loan proposal before Lehman's committees. [D.E. No. 143-7 at 12]. Thus, Pytosh testified that the discussions never moved from the informal stage to the formal stage where Lehman's loan and credit committees would conduct due diligence on the loan proposal

Accordingly, given Pytosh's uncontroverted testimony on the status of the discussions between Lehman and WSI, the district court properly concluded that the proposed financing agreement was too inchoate to ever vest WSI with prospective legal or contractual rights. The district court also noted that there

12

were other contingencies and variables which remained to be resolved such as whether BOA and CIBC would, in fact, waive the financial covenants in WSI's SCF, whether they would approve the Omni acquisition, and whether they would require that WSI acquire a separate company, RCI, before they would finance the remainder of the greenshoe loan package. WSI argues that there was sufficient evidence that BOA and CIBC would have approved WSI's plans to acquire Omni and would have waived the covenants in the SCF.[2] WSI also argues that BOA and CIBC's approval of the greenshoe package was not contingent upon WSI's acquisition of RCI. However, it is immaterial whether BOA and CIBC would have approved the greenshoe loan package because WSI does not allege that the Defendants tortiously interfered in its business relationship with BOA and CIBC. Suppositions of what a lender "would or would not have done are not relevant to the claim of interference," the test is whether there was an actual understanding. *St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc*. 784 So.2d 500, 505 (Fla. 5th DCA 2001). Thus, the Court finds that the district court did not abuse its discretion when it struck Dr. Chamberlain's opinion

[2]WSI asserts that Robert Rospierksi, the BOA executive in charge of WSI's loans, told WSI that BOA would provide $5 million and CIBC would loan $5 million as well, provided that Lehman came through with the promised $10 million. WSI bases this assertion on the deposition testimony of its CEO, David Sutherland-Yoest and its Director, George Matelich, who recounted Rospierski's alleged statement. However, the district court notes that Rospierski was not listed on any party's witness list nor was he ever deposed. Thus, his alleged out-of-court statement which was being offered for the truth of the matter asserted, could not come in at trial under any hearsay exception and was thus, inadmissible.

testimony that, judging by customary banking practices, BOA and CIBC would have waived the covenants in their SCF, allowing WSI to obtain additional financing through Lehman. The testimony was conjectural and ultimately, not relevant to WSI's claim that the Defendants tortiously interfered in its business relationship with Lehman.

As Mark Pytosh testified, he lacked the authority as Lehman's point person on the waste services market, to commit Lehman to finance the proposed loan. His authority was limited to packaging a proposal for presentation to Lehman's loan and credit committees so that they could conduct due diligence on the proposal, and he never brought the greenshoe loan proposal before the committees. WSI did not dispute Pytosh's testimony on these facts.

Accordingly, the district court's decision is **AFFIRMED**.[3]

---

[3]Because we affirm the district court's decision to award WM and Myers summary judgment, we need not reach the choice of law issue that Myers raises in his conditional appeal.