NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11424

A.J. PROPERTIES, LLC  vs.  STANLEY BLACK AND DECKER, INC.


Suffolk.     May 5, 2014. - September 5, 2014.

Present:  Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.[1]


Assignment.  Debt.  Mortgage, Assignment.  Contract, Assignment, Surety.  Surety.  Bond, Private building project, Construction and contract bond.  Environment, Environmental cleanup costs.


Certification of a question of law to the Supreme Judicial Court by the United States District Court for the District of Massachusetts on April 8, 2013.


Gerard A. Butler, Jr. (Andrew D. Black with him) for the defendant.
John A. Mavricos for the plaintiff.


DUFFLY, J.  At issue in this case is the right to payment under

a performance bond issued to secure the obligation of an environmental

consulting company to perform environmental remediation of a

contaminated site that included land that had been owned by Stanley

Black and Decker, Inc. (Stanley).  In 2011, A.J. Properties, LLC (A.J.

_____

[1] Chief Justice Ireland participated in the deliberation on this case prior to his retirement.

Properties), commenced the underlying action in the Superior Court, contending that it had acquired the rights to payment under the bond, and that Stanley had wrongfully collected payment. A.J. Properties argued that Stanley had assigned the rights to payment when it assigned a mortgage on the property to the Wyman-Gordon Company (Wyman-Gordon), which later assigned the mortgage to A.J. Properties.

After Stanley removed the case to the United States District Court for the District of Massachusetts, a judge of that court certified the following question to this court pursuant to S.J.C. rule 1:03, as appearing in 382 Mass. 700 (1981):

> "Does the rule of Quaranto v. Silverman, 345 Mass. 423, 426-[427] (1963) [(Quaranto)], that 'the assignment of a debt carries with it every remedy or security that is incidental to the subject matter of the assignment and could have been used or made available to the assignor,' extend to a situation where a mortgage and a surety agreement secured an obligation, and both the mortgagor and the surety breached that obligation prior to a written assignment of the mortgage, does the assignee, by operation of law, acquire the right against the surety's receiver for the surety's breach of its obligation?"

We answer that whether the right against the surety's receiver is deemed assigned by operation of the rule of Quaranto, supra, depends on whether the right is an incident to the subject matter of the assignment. If it is, and the parties do not manifest an intent not to assign the right, the right may be assigned by operation of the rule stated in Quaranto, supra. The nature of the obligation and the breach, however, could be such that the right against the surety's

receiver would not be an incident to the subject matter of the assignment, but, rather, a collateral cause of action. If so, the right against the receiver would be assigned only if the parties manifested an intent to make such an assignment. In the particular circumstances of this case, the answer to the question depends on interpretation of the agreement to assign the mortgage and the obligations it secured, as well as the nature of the breach which occurred.

Background. We summarize the undisputed facts in the summary judgment record. In 1995, Stanley became aware of soil and groundwater contamination on its property located at 149 Washington Street in Worcester (149 Washington Street property); the contamination extended to an adjacent parcel at 105 Madison Street, owned by Wyman-Gordon, on which Wyman-Gordon operated an industrial facility. Stanley faced liability for the contamination pursuant to G. L. c. 21E,[2] and entered into an agreement with Vargo & Associates Environmental Consulting Corporation (Vargo) to remediate both the 149 Washington Street and Wyman-Gordon properties. Stanley agreed to pay Vargo $400,000 to perform the remediation, and to sell the 149 Washington Street property to Vargo for one dollar. In December, 1997, Stanley and Vargo entered into a purchase and sale agreement

---

[2] As a former owner of the property, Stanley Black and Decker, Inc. (Stanley), faced continuing liability under G. L. c. 21E, § 5 (a).

for the 149 Washington Street property that included the following conditions for the closing of the sale.  Vargo was to obtain and deliver a performance bond in the amount of $800,000; to deliver an indemnity agreement executed by it and its principal, Patrick Vargo,[3] promising to complete the remediation and to hold Stanley harmless from all liabilities arising from any breach by Vargo; and to grant Stanley a mortgage on the 149 Washington Street property (1997 mortgage).  The mortgage was to "secure all obligations" of Vargo and its principal to Stanley under the indemnity agreement, mortgage, and "all other agreements between" Stanley and Vargo, including any "indebtedness, obligations and liabilities" under "instruments . . . executed or delivered in conjunction [with the purchase and sale agreement or the indemnity agreement]."[4]  All documents were

---

[3] For simplicity, we refer to Vargo & Associates Environmental Consulting Corporation as Vargo, and to its principal, Patrick Vargo, by his full name.

[4] Specifically, the mortgage Vargo granted Stanley on the 149 Washington Street property (1997 mortgage), titled "mortgage and security agreement," states that Vargo grants the mortgage as security for

"(1) Performance of each agreement of [Vargo] incorporated by reference or contained herein; (2) payment of the Obligations (as defined in the Mortgage Rider); (3) payment of such additional sums as may hereafter be advanced for the account of [Vargo] or assigns by [Stanley], with interest thereon; and (4) payment and performance by [Vargo] of each obligation contained in any document, contract and agreement delivered to [Stanley] in conjunction with the sale of the Property to [Vargo], including without limitation (i) the Agreement of Purchase and

executed, Vargo obtained a $800,000 performance bond, and the closing took place.

In 2001, before remediation was complete, Vargo suspended remediation operations and abandoned the site. Stanley attempted to obtain performance from Vargo pursuant to their agreements; in January 2002, Stanley was advised by counsel for Vargo that Patrick Vargo had filed for personal bankruptcy. In February, 2002, Stanley contacted United Capitol Insurance Company (United Capitol), the surety on the performance bond, to request performance as surety under the bond, and learned that United Capitol had become insolvent and ceased operation earlier that month and liquidation proceedings had commenced. In October, 2002, Stanley filed a proof of claim under the bond with the receiver for United Capitol in the amount of $800,000, the full amount of the bond.[5]

In December, 2002, Stanley entered into a settlement agreement with Wyman-Gordon, which provided that Wyman-Gordon would retain a different contractor to remediate the contaminated portions of the

---

Sale of Real Property and Joint Escrow Instructions, and (ii) the Environmental Compliance and Indemnity Agreement . . . ."

The rider to the mortgage defined "Obligations" as including Vargo's "indebtedness, obligations and liabilities" under "instruments . . . executed or delivered in conjunction [with the purchase and sale agreement or the indemnity agreement]."

[5] In 2010, Stanley received payment from United Capitol's receiver in the amount of $659,000 as settlement of the claim.

149 Washington Street and Wyman-Gordon properties, and that Stanley would contribute $599,000 to the total cost of the remediation, which was fixed at $855,000. Stanley also agreed to assign to Wyman-Gordon at a future date the 1997 mortgage on the 149 Washington Street property and the obligations secured by the mortgage.

In February, 2003, creditors of Vargo foreclosed on a second mortgage on the 149 Washington Street property; A.J. Properties purchased the right to acquire the property at the foreclosure sale.[6] In March, 2003, after Wyman-Gordon had signed the settlement agreement with Stanley, but before it had been assigned the 1997 mortgage, Wyman-Gordon entered into an agreement with A.J. Properties. That agreement provided that A.J. Properties would assign to Wyman-Gordon the right to purchase its interest in the 149 Washington Street property, and that, at the option of A.J. Properties, Wyman-Gordon would assign to A.J. Properties the 1997 mortgage on a portion of the 149 Washington Street property,[7] as well as "all rights that Wyman-Gordon has to the obligations and debts which the [1997

---

[6] Stanley notes in its brief (and it does not appear to be disputed) that in 1998, Vargo obtained a loan from a bank in exchange for a promissory note, secured by a mortgage on certain parcels comprising a part of the 149 Washington Street property.

[7] The assignment agreement specified that the 1997 mortgage would encumber only parcels 13-18 and parcels 20-21, a portion of the 149 Washington Street property that is now leased by a fast food restaurant chain. Wyman-Gordon had the option to discharge the mortgage with respect to the remainder of the 149 Washington Street property.

Mortgage] secures."

Stanley assigned the 1997 mortgage to Wyman-Gordon in May, 2003, pursuant to the settlement agreement between Stanley and Wyman-Gordon. In 2007, A.J. Properties exercised its option to acquire the 1997 mortgage from Wyman-Gordon; Wyman-Gordon executed an assignment granting to A.J. Properties the 1997 mortgage "and the claims secured thereby."[8]

Prior proceedings. In 2011, A.J. Properties commenced the underlying action against Stanley in the Superior Court. A.J. Properties alleged that it had been assigned the right to recover all funds paid to Stanley by the receiver for United Capitol in settlement of the claim under the performance bond. Stanley removed the case to the United States District Court for the District of Massachusetts. A.J. Properties then moved for partial summary judgment and Stanley filed a motion for summary judgment. A Federal District Court judge determined that A.J. Properties was entitled to the amounts paid by United Capitol's receiver to Stanley, and allowed, in part, A.J. Properties's motion for summary judgment.

In allowing A.J. Properties's partial motion for summary judgment, the District Court judge determined, based on a number of

---

[8] Soon after it obtained assignment of the 1997 mortgage, A.J. Properties brought a claim in the Superior Court against Vargo under the 1997 Environmental Compliance and Indemnity Agreement and the 1997 mortgage. After Vargo defaulted, a Superior Court judge entered a judgment of approximately $1.2 million in favor of A.J. Properties.

written instruments executed by the parties,[9] "that the performance bond was indeed among the obligations that were secured by the mortgage." The judge determined further that the "subsequent assignments of the [1997] mortgage, which included the obligations secured by [the mortgage], also included the right to recover against the surety [United Capitol] for the performance bond." The judge noted that he reached this determination by applying the rule set forth in Quaranto, supra, that "the assignment of a debt carries with it every remedy or security that is incidental to the subject matter of the assignment and could have been used or made available to the assignor," and that, pursuant to that rule, United Capitol's "liability under the bond is a remedy incidental to the duty of [Vargo] to pay what was available to Stanley before it assigned that obligation; thus, the assignment of the duty of [Vargo] carried with it that of its surety." Stanley sought interlocutory review in the United States Court of Appeals for the First Circuit, pursuant to 28 U.S.C. 1292(b), contending that the District Court judge misapplied the rule of Quaranto. The Court of Appeals recommended certification of the question to this court.

Discussion. a. Common-law background. In order to

---

[9] These included the 1997 mortgage, the 2002 settlement agreement, the 2003 assignment from Stanley to Wyman-Gordon, the 2003 option agreement, and the 2007 assignment from Wyman-Gordon to A.J. Properties.

effectuate an assignment of an interest, an assignor must make manifest an intention to transfer that interest to an assignee. See Restatement (Second) of Contracts § 317 (1) (1981) ("An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance"). In Quaranto, supra at 426-427, we noted in dicta the default rule that, where an assignor assigns a debt, the assignor thereby also assigns any security he or she holds for the debt. Id. ("Generally, the assignment of a debt carries with it every remedy or security that is incidental to the subject matter of the assignment"). We noted two cases in which we had applied this general rule, Brazill v. Green, 236 Mass. 93, 98 (1920), and Rogers v. Abbot, 206 Mass. 270, 272 (1910) (upon assignment of debt, security for debt "passed to [assignee] as an incident to the [debt]"), and also cited additional authority. See Morris v. Bacon, 123 Mass. 58, 59 (1877) ("the debt is the principal and the mortgage an incident"); Restatement of Contracts, § 171(2) (1932); 4 Corbin, Contracts § 907 (1950); W.H.E. Jaeger, Williston on Contracts § 432A (3d ed. 1960) (Williston on Contracts [3d ed.]).[10] Parties who intend to assign

---

[10] The treatises cited in Quaranto v. Silverman, 345 Mass. 423, 427 (1963) (Quaranto), have since been updated; the principle as stated remains unchanged. See 1 R.A. Lord, Williston on Contracts § 74:51 (4th ed. 2003); 9 J.E. Murray, Corbin on Contracts §§ 47.7,

only the debt and not the security for the debt may do so by making this intent clear in their assignment agreement.  See 4 Corbin, Contracts, § 907; Williston on Contracts (3d ed.) § 432A; Restatement (Second) of Contracts § 340 comment c, at 88-89 (1981).

The theory underlying the default rule in Quaranto, supra, is that when parties assign a debt, it generally may be assumed that they also intend to assign the security for that debt, because an interest in retaining the security to enforce the debt generally dissipates once the debt has been assigned.  See 4 Corbin, Contracts, § 907 ("[t]his is the general rule . . . because such is usually the intention of the assignor and assignee and there is ordinarily no reason for letting the assignor keep the security or for giving it back to the obligor").  Applying this principle to the assignment of a note secured by a mortgage, we have said that, upon such assignment, the assignee receives an equitable right to the mortgage even if the mortgage is not mentioned in the assignment, because the mortgage is an incident to the note.  See Barnes v. Boardman, 149 Mass. 106, 114 (1889).

The rule that the assignment of a debt generally carries with it the assignment of security for the debt is an example of the broader principle that, in general, an assignment carries with it all the

---

51.1 (Rev. ed. 2007); Restatement (Second) of Contracts § 340(2) (1981).

rights that are "incidental to" the subject matter of the assignment. See Brazill v. Green, supra (when assignor assigns judgment, that which is incident to judgment passes to assignee without formal transfer); 1 R.A. Lord, Williston on Contracts § 74:51 (4th ed. 2003) (Williston on Contracts [4th ed.]) (collecting cases). This general rule, however, has an important limiting principle: an interest that is merely related to the subject matter of the assignment, but not incidental to it, is not assigned by implication. "In order for a right to pass as an incident under an assignment of [an interest] it must, in a legal sense, constitute a security for the debt. It must be more than a mere collateral right of action." Williston on Contracts (4th ed.) § 74:51 at 564. See Robinson v. Towns, 30 Ga. 818, 822 (1860) (assignment of judgment carried with it interest in further enforcement of judgment, but not interest in money that sheriff had collected on judgment prior to assignment); Commonwealth v. Wampler, 51 S.E. 737, 738 (Va. 1905) ("assignment of a chose in action [generally does not] invest in the assignee, as an incident, a litigious right against a third party to recover damages for an injury which accrued prior to the assignment").

Additionally, just as an assignment of a claim does not carry with it a collateral cause of action, "the assignment of rights under a continuing contract does not imply an assignment of rights of action for previous breaches of the contract." Williston on Contracts (3d

ed.) § 431. See <u>National Reserve Co. of Am</u>. v. <u>Metropolitan Trust Co. of Cal</u>., 17 Cal. 2d 827, 833 (1941) ("Unless an assignment specifically or impliedly designates them, accrued causes of action arising out of an assigned contract . . . do not pass under the assignment as incidental to the contract if they can be asserted by the assignor independently of his continued ownership of the contract and are not essential to a continued enforcement of the contract"). See, e.g., <u>Anheuser-Busch, Inc</u>. v. <u>Miller</u>, 99 B.R. 137, 139-140 (D. Mass. 1989); <u>Steele</u> v. <u>Brazier</u>, 123 S.W. 477, 482 (1909); <u>Love</u> v. <u>Van Every</u>, 18 Mo. App. 196, 203-205 (1885) (collecting cases); Restatement (Second) of Contracts § 328 (1981); 4 Corbin, Contracts § 876. See also <u>Ginsberg</u> v. <u>Austin</u>, 968 F.2d 1198, 1201 (Fed. Cir. 1992) (assignment of reversion does not carry with it right to recover all rents accrued prior to assignment).

In some circumstances, it may be difficult to distinguish between a collateral cause of action that is not assigned by implication, and a security for a debt that is assigned by implication. See <u>Commonwealth</u> v. <u>Wampler</u>, 51 S.E. 737, 738 (Va. 1905) ("The distinction as to what does and what does not pass by incidental assignment is in some instances nice and difficult to draw"); <u>Heyer</u> v. <u>Kaufenberg</u>, 40 Wyo. 367, 371-373 (1929) (collecting cases).[11]

---

[11] The analysis of the Supreme Court of Wyoming in <u>Heyer</u> v. <u>Kaufenberg</u>, 40 Wyo. 367 (1929) is instructive. In that case, the

Making such a determination turns on whether the interest in question is "incident to" that which is assigned, that is, whether the interest in question "usually or naturally and inseparably depends upon, appertains to, or follows" that which is assigned. Commonwealth v. Wampler, supra, quoting 1 Bouvier Law Dictionary 1006 (Rawle's Rev. 1897).

b. Application to reported question. Where a mortgage and a surety agreement secured an obligation,[12] and both the mortgagor and the surety committed a breach of that obligation prior to a written

---

assignor obtained money judgments in his favor and subsequently assigned them. Id. at 369. Before the assignment, the assignor executed the judgments, and levies were made under those executions upon property that was in the possession of a receiver. Id. Prior to the foreclosure sale, the property owner filed an injunction bond in the sum of $500 that was backed by a surety, and the court issued an order restraining the foreclosure sale. Id. The assignor successfully moved to dissolve the restraining order, and after the order had been dissolved, he assigned all his rights in the judgments. Id. at 370. The assignor then filed suit against the surety for attorney's fees and costs incurred in dissolving the restraining order, and the surety objected that the assignor could not maintain any action upon the bond because he had assigned his interest in the bond when he assigned the underlying judgments. Id. In holding that the assignment of the underlying judgments did not carry with it the right to damages under the bond, the court reasoned that the assignor's rights under the bond were in no sense "'naturally and inseparably' dependent upon the judgments and hence were not incident to them. Neither were such rights in any way a security held by the assignor, for the payment of the judgments, nor did they furnish any remedy to accomplish their collection." Id. at 377, quoting Commonwealth v. Wampler, 51 S.E. 737, 738 (Va. 1905).

[12] We assume the facts as stated by the Federal District Court judge, relying on his determinations as to what was secured by the mortgage.

assignment of the mortgage, the certified question requires a determination whether the right against the surety's receiver for the surety's breach of its obligation is a collateral cause of action that remains with the assignor unless expressly assigned, or whether it is an "incident to" the subject matter of the assignment such that it is deemed to be acquired by the assignee by implication of law.

The answer to this question depends on the nature of the obligation and the breach. The obligation at issue in this case is the performance bond Vargo was required to obtain under the terms of the purchase and sale agreement prior to issuance of the 1997 mortgage. The bond provided that Vargo as principal, and United Capitol as surety, were bound to Stanley in the amount of $800,000; that the obligation would be void upon Vargo's performance of remediation under the compliance and indemnity agreement; and that if Vargo defaulted on its promise to remediate, United Capitol was obligated promptly to remedy the default, complete the remediation, or arrange for the lowest responsible bidder to complete the remediation and pay for the costs of completion up to $800,000.[13]

Under the terms of the assignment agreement, A.J. Properties was

---

[13] The bond was a performance bond, not a payment bond. See National Fire Ins. Co. of Hartford v. Fortune Constr. Co., 320 F.3d 1260, 1271, 1278 (11th Cir.), cert. denied, 540 U.S. 873 (2003) (distinguishing between performance bond and payment bond: purpose of performance bond is to assure obligee that underlying obligation will be completed and that obligee will not be liable for costs in excess of contract price if primary obligor defaults).

assigned the 1997 mortgage and the claims and obligations secured thereby. It is unclear whether, in interpreting the "performance bond [as] indeed among the obligations that were secured by the [1997] mortgage," the Federal District Court judge determined that only Vargo's obligation to <u>obtain</u> the performance bond was secured by the mortgage, or that Vargo's obligation to render <u>performance</u> on the bond (that is, to complete remediation, or, upon failure to do so, to pay Stanley $800,000) was secured by the mortgage.[14] We consider each possibility in turn.

If the obligation secured by the mortgage was to obtain a performance bond, but not the obligation to perform on the bond, then the rule of <u>Quaranto</u> would not apply, and the right to recover against the surety would not be deemed to have been assigned by implication.[15]

---

[14] The parties dispute what was included in the subject matter of the assignment by the express terms of the assignment agreement. A.J. Properties maintains that the assignment, by its terms, included the 1997 mortgage and all "claims secured thereby," which it alleges encompassed the right to recover against Vargo for defaulting on its obligations in the performance bond and the right to recover against United Capitol for defaulting on its obligations in the performance bond. If A.J. Properties is correct that the express terms of the assignment included the right to recover against United Capitol, then there would be no need to apply the rule stated in <u>Quaranto</u>, and the answer to the reported question would be irrelevant to the resolution of the dispute.

[15] The certification order states that the 1997 mortgage was executed on December 31, 2007, and that Vargo subsequently obtained the performance bond on January 22, 1998. According to the purchase and sale agreement, obtaining the performance bond was a condition precedent to the closing, but not a condition precedent to the

The reason for this is that if the obligation to obtain the bond was part of the debt that was secured by the mortgage, and the mortgagor would have been permitted to foreclose on the mortgage if the mortgagee failed to obtain the bond, then obtaining the bond was analogous to making payments under an instalment note secured by the mortgage. The procurement of the bond was part of the debt or obligation itself, and delivery of the bond fulfilled that part of the obligation. The assignment of a security does not carry with it a debt that already has been satisfied.

If, on the other hand, the obligation secured by the mortgage was an obligation to perform, and that obligation was separately secured by a bond, the obtaining of which also was secured by the mortgage, the Quaranto rule may apply. The rule might have applied if, for example, at the time of the assignment to Wyman-Gordon, Vargo had defaulted on its obligation to perform remediation but United Capitol had not committed a breach of its obligation as surety to perform remediation or otherwise remedy the default by Vargo. Under such circumstances, an assignment of the right to recover against Vargo for its obligation to perform on the bond might have carried with it an assignment of the right to recover against United Capitol for its obligation to perform on the bond, including the right to recover the full amount of the bond in the event of a subsequent

execution of the 1997 mortgage.

material breach by United Capitol of its obligation to perform.  See Brainerd, Shaler & Hall Quarry Co. v. Brice, 250 U.S. 229, 233 (1919) (assignment of obligation against primary obligor that is secured by surety generally carries with it assignment of obligation against surety); Restatement (Third) of Suretyship & Guaranty § 13 (1996).

The Quaranto rule might not apply, however, when both the obligation to perform and separate security for that performance are secured by a mortgage, and where, prior to the assignment of that mortgage, there has been a breach of the obligation to perform and of the surety's obligation to secure performance.  Whether the rule of Quaranto, supra, applies in such circumstances depends on the nature of the breach at issue.  The rule does not apply, for instance, where the surety was liquidated prior to the time of assignment.

If the mortgagor has committed a breach of its agreement to perform, and the entity acting as a paid surety on a performance bond has been liquidated prior to the time of assignment, then the surety is no longer able to perform the underlying obligation.  In that case, what remains prior to the assignment is not a claim against the surety's receiver for performance or payment on the bond, but rather a claim against the surety's receiver in the nature of damages for a breach of contract.  See Commissioner of Ins. v. Massachusetts Acc. Co., 314 Mass. 558, 565 (1943), quoting Carr v. Hamilton, 129 U.S. 252, 256 (1889) (upon liquidation, company's business "is brought to

an absolute end, and the policy holders become creditors to an amount equal to the equitable value of their respective polices, and entitled to participate pro rata in its assets"); In re Liquidation of Integrity Ins. Co., 147 N.J. 128, 135 (1996), quoting 19A J. A. Appleman & J. Appleman, Insurance Law & Practice § 10721, at 196 (1982) ("The common-law rule is that '[w]here an insurance company is adjudged insolvent, the claims existing on behalf of its policyholders have been held to be in the nature of damages for a breach of contract'"); 1 Couch on Insurance, § 6:1 (3d rev. ed. 2009); 11 Couch on Insurance, § 163:17 (3d ed. 2005) (bonds issued by paid surety companies to protect property owners from loss due to failure of contractors to perform conditions of building or other similar contracts are considered as essentially contracts of insurance for some purposes).

A claim against the surety's receiver in the nature of damages for a breach of contract is neither security for an obligation nor in any other way an incident to the obligation secured by the mortgage; rather, it is a collateral cause of action. The value of this cause of action does not "depend[] upon, appertain[] to, or follow[]" an underlying obligation. See Heyer v. Kaufenberg, 40 Wyo. 367, 373 (1929), quoting Commonwealth v. Wampler, 51 S.E. 737, 738 (Va. 1905). To the contrary, such a cause of action has free-standing value that is determinable upon the date of the surety's liquidation; on that date, it is not dependent on the mortgagor's obligation to perform,

which already has been defaulted on. If parties wish to assign such a cause of action, they may do so by manifesting their intent to do so, but, absent an express indication, assignment of such a cause of action will not be implied by an assignment of the mortgage and the obligations it secures.

Conclusion. For the reasons stated, we answer the reported question as follows: "Where a mortgage and a surety agreement secured an obligation, and both the mortgagor and the surety committed a breach of that obligation prior to a written assignment of the mortgage, the assignee does not necessarily acquire the right against the surety's receiver for the surety's breach of its obligation."

The Reporter of Decisions is directed to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of the court, to the clerk of the United States District Court for the District of Massachusetts, as the answer to the question certified, and will also transmit a copy to each party.